109 So.2d 844

**STATE of Alabama**

v.

**ALBRIGHT AND WOOD, INC.**

**3 Div. 822.**

Supreme Court of Alabama.

Feb. 19, 1959.

608

John Patterson, Atty. Gen., and Willard W. Livingston, Asst. Atty. Gen., for appellant.

Chas. E. Clark, John R. Thomas, Jas. A. Simpson and Lange, Simpson, Robinson & Somerville, Birmingham, for appellee.

COLEMAN, Justice.

The ultimate question in this case may be stated as follows: Is sales tax due from a druggist on a bottle withdrawn from stock and used as a container by the druggist to re-package medicine which he has *not* compounded but has placed in the bottle for sale at retail to the patient, although the cost of the bottle is included in the total price to the patient as a separate, specific, and substantial element of that price?

The State Department of Revenue assessed appellee, hereinafter referred to as taxpayer, for sales tax allegedly due for the period April 1, 1955, through September 30, 1956. Taxpayer appealed to Circuit Court of Montgomery County, in Equity, where decree was rendered reversing and avoiding the assessment. From the decree of the circuit court, the State has appealed to the Supreme Court.

Taxpayer is engaged in the retail drug business. It sells prescriptions and medicines packaged in bottles which taxpayer buys empty at wholesale, free from sales tax. Taxpayer's ledger sheet and the testimony show that the bottles are carried in stock the same as other merchandise. Cost of the bottles is not charged as an expense item, although expense charges appear on the ledger for wrapping paper, twine, brooms, mops, and that sort of article.

Some bottles are used to package prescriptions compounded by taxpayer. The State concedes that no sales tax is due on bottles used to package such prescriptions because of § 752(1) (i), Title 51, Code 1940.

Taxpayer uses some bottles, however, to package medicines which taxpayer does not compound. As an illustration, Cheracol is purchased by taxpayer in larger quantities, usually in pints. Without adding anything to Cheracol, taxpayer places some of it, for example, 4 ounces, in a 4 oz. bottle, and sells it to the customer.

Taxpayer's records do not disclose how many bottles are used to contain compounded prescriptions nor how many bottles are used to contain uncompounded items. Since taxpayer cannot show how many bottles are exempt, the State insists all bottles must be treated as taxable.

The bottles in question are carried in taxpayer's inventory as merchandise. Some bottles are sold empty. Most of the bottles sold contain medicine, and the greater number contain prescriptions compounded by taxpayer.

The manager of taxpayer's store is given a price tabulation which states the cost and the sales price of the various sizes of bottles, e. g., an 8 oz. bottle costs 6¢ and is sold for 15¢. The selling price is approximately twice the cost price.

Managers and clerks are furnished also tabular charts showing for "Prefabricated Liquids," the "Cost Per Pint," "Cost Per Ounce," and sales price for 1, 2, 3, etc. ounces. A similar chart is provided for prefabricated capsules and pills.

A specific example for calculating the price of a prescription is given as follows: Assume ingredients cost 40¢ and the bottle costs 6¢, which together make 46¢ the cost of ingredients and bottle. The markup is 100%, and the retail sale price of bottle and ingredients is 92¢, to which, for a compounded prescription, is to be added the cost of time consumed by the druggist at the rate of $3.00 per hour. On the gross price thus arrived at, taxpayer charges the customer sales tax at the rate of 3%, which taxpayer in turn remits to the State.

Taxpayer does not tell the customer how the final price is arrived at unless the customer inquires. When he does inquire, the customer is informed of the elements making up the price and the cost of the bottle.

For sanitary reasons, taxpayer's clerks are instructed not to re-use prescription bottles in refilling a prescription. If, however, in refilling a prescription a bottle should be re-used, the retail price for the refill would be "the same price" as for the original prescription and sales tax would be collected from the customer and remitted to the State on that price basis.

As we understand the record, if taxpayer sells a prefabricated medicine, not compounded by taxpayer, as in the example, for 92¢, and repeats the transaction 100 times, his total sales price is $92.00 plus sales tax of $2.76, and taxpayer remits the $2.76 to the State. In this suit, the State claims it is due an additional 3% of the cost of the bottle to taxpayer, that is 3% of $6.00 (100 bottles at 6¢), or an additional 18¢. Taxpayer says that under the procedure shown by the testimony, taxpayer has already remitted 3% of $12.00 (100 bottles at 12¢ each), or 36¢, as sales tax for the bottles.

The State contends, that although as to a bottle used to package medicine which taxpayer has compounded, no tax is due under § 752(1)(i), nevertheless, as to a bottle used to contain a medicine such as Cheracol, which taxpayer has not compounded, a tax is due to be paid by taxpayer when the bottle is withdrawn from stock and used by taxpayer to contain the uncompounded item. The State says such tax is due by reason of § 752(1)(j) which recites in pertinent part:

"* * * The term 'sale at retail' * * * shall * * * include the withdrawal * * * of any tangible personal property by anyone who pur-

chases same at wholesale, except property which has been previously withdrawn from * * * stock * * * and with respect to which property the tax has been paid * * *; and such wholesale purchaser shall report and pay the taxes thereon."

The State's answer to the bill of complaint avers that tax liability in this case is based on Revenue Department Regulation C27–038 which recites as follows:

"Retail druggists, pharmacists, and wholesale drug suppliers and others purchase at wholesale, tax free, the bottles, boxes, jars, wrappers, powder papers, or other containers, together with the labels thereof, not otherwise exempted, which are furnished to their customers along with the medicines which they compound or manufacture for sale. In instances where such retail druggists, pharmacists, wholesale drug suppliers, or other compounders or manufacturers of medicines are also using the same kinds of containers to package products which they do not compound or manufacture for sale, such use of the containers is subject to sales tax based upon the withdrawal from stock of the containers so used. In these instances the measure of the tax is the price paid for the containers.

"To be exempted the containers and labels must be used to package and label a product or products which the seller has compounded by uniting two or more substances or which he has manufactured for sale. The Sales and Use Tax Laws do not exempt containers and labels which are used to repackage medicines which are resold in the form in which they are purchased from sources of supply. Issued 7–16–52."

The State argues that Regulation C27–038 is supported by City Paper Co. v. Long, 235 Ala. 652, 180 So. 324; Durr Drug Co. v. Long, 237 Ala. 689, 188 So. 873; and

§ 752(1), paragraphs (i) and (j), Title 51, Code 1940.

Article 10 of Chapter 20, Title 51, Code 1940 (§ 752 et seq.), imposes a license tax to be determined as a percentage of gross receipts, on every person engaged within this State, in the business of "selling at retail" any tangible personal property. As amended by Act No. 305, General Acts 1947, page 160, § 752, Title 51, sets out the following definitions:

" * * * (i) The term 'wholesale sale' or 'sale at wholesale' means a sale of tangible personal property by wholesalers to licensed retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale. The term 'wholesale sale' shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient or component part of the tangible personal property or products which he manufactures or compounds for sale, and the furnished container and label thereof. (j) The term 'sale at retail' or 'retail sale' shall mean all sales of tangible personal property except those above defined as wholesale sales. The quantities of goods sold or prices at which sold, are immaterial in determining whether or not a sale is at retail. Sales of building materials to contractors, builders, or landowners for resale or use in the form of real estate are retail sales in whatever quantity sold. Sales of tangible personal property or products to manufacturers, quarry operators, mine operators or compounders, which are used or consumed by them in manufacturing, mining, quarrying or compounding and do not become an ingredient or component part of the tangible personal property manufactured or compounded are retail sales. The term 'sale at retail' or 'retail sale' shall also mean and include the withdrawal, use or con-

sumption of any tangible personal property by any one who purchases same at wholesale, except property which has been previously withdrawn from the business or stock and so used or consumed and with respect to which property the tax has been paid because of such previous withdrawal, use or consumption, and except property which enters into and becomes an ingredient or component part of tangible personal property or products manufactured or compounded for sale and not for the personal and private use or consumption of any person so withdrawing, using or consuming the same; and such wholesale purchaser shall report and pay the taxes thereon. * *"

So far as we are advised, later amendments have not changed the definitions copied above and the statute as so copied is the statute which applies in this case.

The present sales tax law in this State appears to stem from Act No. 126, General Acts, Extra Session 1936–37, page 125. See Alabama-Georgia Syrup Company v. State, 253 Ala. 49, 52, 42 So.2d 796. This act is hereinafter referred to as the 1937 Act. It remained in effect two years, from March 1, 1937, to March 1, 1939, when it was repealed and superseded by Act No. 18, General Acts 1939, page 16.

The 1937 Act gave rise to cases wherein this court construed certain definitions set out in that act as follows:

" * * * (h) The term 'wholesale sale' or 'Sale at wholesale' means a sale of tangible personal property by wholesalers to licensed retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale. The term 'wholesale sale' shall include a sale of tangible personal property or products to a manufacturer mine, quarry operator, or compounder which enters into and becomes an ingredient or component part of the tangible personal property or products

which he manufacturers [sic] and machinery used in such compounding, mining, quarry operator, manufacturing or processing. (i) The term 'sale at retail, or 'retail sale' shall mean all sales of tangibles [sic] personal property except those above defined as wholesale sales. The quantities of goods sold or prices at which sold are immaterial in determining whether or not a sale is at retail, except as herein expressly provided. Sales of building materials to contractors, builders or landowners for resale or use in the form of real estate are retail sales in whatever quantity sold. Sales of tangible personal property or products to manufacturers, quarry, mine operators or compounders, which are consumed by them in manufacturing mining, quarrying or compounding and do not become an ingredient or component part of the tangible personal property manufactured or compounded are retail sales. * * *"

In 1938, in City Paper Co. v. Long, supra, this court affirmed a decree of the circuit court which declared:

" * * * 'That sales made by the complainants, in the State of Alabama of wrapping paper, twine, paper bags, paper cartons and other paper containers and similar articles to licensed retail merchants, jobbers, dealers, manufacturers, or other wholesalers, for use by the purchasers as containers or wrapping of tangible personal property, which such purchasers sell to their customers and the title to which such wrapping paper and other articles passes to the customers at the same time as the merchandise contained therein, are taxable under the Alabama Retail Sales Tax Act,' and denying an injunction restraining and enjoining the State Tax Commission from the collection of the tax." 235 Ala. 652, 653, 654, 180 So. 324, 325.

The opinion in that case recites in pertinent part as follows:

"The contention of the appellants (taxpayers), * * * is that the sales * * * to * * * the retailer * * * are sales for resale, and such retailers * * * are not the ultimate consumers of such * * * wrappings.

"The basis of this contention is the fact that the cost of such * * * wrappings * * * is figured into the composite price of the merchandise which the retailer and jobber sell to their customers.

*    *    *    *,    *    *

" * * * it is clear beyond a shadow of doubt that the commodities (wrappings) * * * are not in fact sold by the retailers to their customers. Such wrappings and cartons are *used* by the retailer * * * and the fact that the cost to the retailer is figured into the composite price and delivered with the articles * * * inclosed or wrapped therein is wholly immaterial. These (the wrappings) are used, and, * * * consumed by the retailer * * * as an incident to * * * business, and the cost * * * is figured in as a part of the overhead expense of the business. * * *" (Par. added and Emphasis supplied.)

It will be noted that the City Paper Company case, supra, concerned wrapping paper and cartons, but did not mention bottles. In Durr Drug Co. v. Long, supra, however, decided in 1939, bottles were among the articles used as wrappings and considered in that case. The opinion recites in pertinent part:

"The question presented by this appeal is whether or not Act No. 126 * * * levies a 2% tax:

"On the sale of cardboard powder boxes, pill boxes, *bottles,* jars and similar containers sold by wholesale druggists to retail druggists, and used by them as containers in the sale and delivery of drugs and medicine to their customers?

*    *    *    *    *    *

"The circuit court ruled that the tax was levied by said Act * * * and that appellant was liable to account therefor.

"After mature consideration we are of opinion that the circuit court ruled correctly.

"The ruling as to the first subject is supported and controlled by City Paper Co. v. Long, 235 Ala. 652, 180 So. 324. * * *

*    *    *    *    *    *

"The use by the retail druggist in the manner indicated by the stipulation of fact destroys the economic value of said containers, and is tantamount to a consumption thereof.

"Medicine cartons, pill boxes and medicine bottles, after they have been used and labeled in the sale of medicine, as a matter of common knowledge, have no resale value. In fact and law the inclusion of the costs of such containers in the price of the medicines sold is not a resale, but is the method of passing the cost of such containers in the price to the customers of the retailer." (Emphasis supplied.) 237 Ala. 689, 690, 691, 188 So. 873.

Perhaps as a result of the City Paper Company and Durr Drug Company cases, supra, Act No. 18, General Acts 1939, page 16, defined "wholesale sale" as follows:

"Section I. * * * (i). The term 'wholesale sale' or 'sale at wholesale' means a sale of tangible personal property by wholesalers to licensed retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale. The term 'wholesale sale' shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient or component part of the tangible personal property

or products which he manufactures *or compounds for sale, and the furnished container and label thereof."* (Emphasis added.)

The *underscored* portion of 1939 Act is the basis for exemption of containers used to package *compounded* medicines, but it affords no exemption to bottles used to package medicine not compounded by the taxpayer.

As to the wrapping paper, etc., Act No. 471, 1943 General Acts, page 435, amended § 755, Title 51, by adding to the exemption from sales tax the following, to wit:

"*  *  *  * '*  *  * (u) The gross proceeds of the sale or sales of wrapping paper, wrapping twine and paper bags.' "

Subdivision (u), supra, now appears as Subdivision (s) of § 755, Title 51, Pocket Parts, 1940 Code.

■ City Paper Co. v. Long and Durr Drug Co. v. Long, supra, were followed and reaffirmed in Birmingham Paper Co. v. Curry, 238 Ala. 138, 190 So. 86. Since those decisions the Legislature has amended § 752, Title 51, in 1943, 1947, 1955, and 1956, without material change in the definition of wholesale sale other than the addition relating to furnished container which was added in 1939. Except for this addition, the definition is substantially the same as the language of the 1937 Act construed by this court as aforesaid. We are bound to assume that the Legislature intended to adopt the construction in City Paper Company and Durr Drug Company with respect to the language there construed. Ala.Dig., Statutes, ☞ No. 223.5 (6).

We do not, in fact, understand taxpayer to contend otherwise. Taxpayer states in brief:

"In the case of Durr Drug Co. v. Long, 237 Ala. 689, 188 So. 873, the facts as apparently stipulated are not the same as the facts in this case. Here the facts show without conflict, and the Court below found, that the pharmacist's 'use' of prescription bottles was limited to that of merely taking this item from stock to be delivered to the purchaser in a resale transaction.

*    *    *    *    *    *

"Had the Court there been informed as was the trial court here, as to the whole act of the druggist in the performance of his profession as a pharmacist in dispensing prescriptions, it is unquestioned but that the Court would have recognized the lack of a consumptive act on the part of the druggist with respect to prescription bottles."

The stipulation of facts in Durr Drug Company, supra, is not set out in full in the report of that case. We have examined the original record and find that the stipulation in that case recites in pertinent part as follows:

"2. That the Durr Drug Company is a corporation * * * doing a wholesale drug business in the City of Montgomery, Alabama; that it * * * made sales * * * of cardboard powder and pill boxes, jugs, jars, and bottles to * * * licensed retail druggists, * * * in substantially the following manner:

"3. That the wholesale druggists * * * sold such cardboard boxes to retail druggists * * * and such boxes were handled by the retail druggists in this manner. A retail druggist is a manufacturer and compounder of medicines in various forms, * * *. These medicines are usually manufactured and compounded upon a prescription or order of a doctor of medicine * * * when the powder form is prescribed, the process is substantially this: The various constituents required * * * are ground together * * * until all the constituents are fully mixed and compounded. The mass is then divided

into the number of separate powders * * *. These powders are placed or wrapped in individual papers, * * * and the whole number placed in a small cardboard box. On the box are entered the prescription number, the doctor's name, and the directions for taking. * * *

" * * * The retail druggist in the manufa(c)ture of articles sold in boxes, sells the completed boxed and labelled product as a unit, at one price, which price includes the cost of the box, the cost of the medicine contained therein, and the retailer's profit on the entire cost, whether such profit is computed separately on the bottle and separately on the medicine, or on the cost of the entire, complete article. *There is a definite price for each size and quality of box.* The proportion of the cost of the box to the whole cost of the completed unit varies, but in a lump price prescription selling for fifty cents, two to five cents represents the cost of the box, and twenty to twenty-five cents represents the cost of the medicine contained therein, and the remainder represents the profit, whether computed separately or not. The purchaser is not advised of a separate price for the medicine and a separate price for the box, but pays a certain sum for the entire unit. The retailer collects from the customer the two per cent. sales tax on the entire selling price of the whole unit.

"*The retail druggist does not charge the cost of boxes as overhead expenses, but carries such boxes as a part of the stock of goods for sale,* and the receipts therefor go into his general gross income. The box usually is not destroyed by having been used as a container, and the purchaser can and does use it as he sees fit.

"It is the contention of the Durr Drug Company that the sales by it of the boxes as above described constitute sales for resale, or that the boxes

handled in the manner described become a component part of the complete manufactured or compounded unit, and in either event are not taxable. * * *

"Bottles:

"The foregoing description of the manner of handling boxes illustrates to a considerable extent the manner in which bottles are handled, * * *. The cost of bottles is, generally speaking, much greater than the cost of the boxes above described, and represents a substantial portion of the sales price of the prescription. In fixing the selling price of the average fifty cents liquid prescription sold in an eight-ounce bottle, five to seven cents represents the cost of the bottle and twenty to twenty-five cents represents the cost of the medicine, and the remainder represents the profit, whether computed separately or not. In some of the inexpensive medicines, the cost of the bottle represents a much larger proportion of the total sales price, and *in some cases the cost of the bottle to the retailer represents the greater proportion of the total selling price.* The completed bottled, labelled product is sold at a unit price, and the customer is not advised of a separate price for the bottle and a separate price for the medicine, but pays a certain sum for the entire unit. The retailer collects from the purchaser the two per cent. sales tax on the price of the entire unit.

"There are likewise sold certain bottles of special make having as a part of the stopper a dropper or other device for special uses. These bottles are substantially more expensive than the ordinary bottle, and when the prescription necessitates the use of such a container, the retail druggist charges in his selling price the cost of such bottle, plus his usual profit thereon, whether computed separately or not. Many of these specially made bottles

are sold to customers empty, constituting a straight sale of merchandise. It is impractical for respondent to determine what bottles sold by the respondent to the retail druggist are resold empty by him and what bottles are handled by the retail druggist in filling prescriptions as above described. While in the present charge against respondent the State is claiming taxes on all bottles sold by it to retail druggists, the State does not claim tax on such as are resold empty, and it is estimated that the amount of such sales approximates two per cent. and the tax claimed would be reduced by $3.54. * * * *The cost of the bottles* is not carried by the retail druggist as a part of his overhead such as light, heat, and salaries, but *is carried as a part of his stock and is included in his inventory.*

\*   \*   \*   \*   \*   \*

"The average cost of the bottle to the retailer is as follows: This cost, together with the cost of the medicine and the usual profit on the combined cost, either computed separately or on the entire cost, makes up the total selling price which the retailer charges:

| | |
|---|---|
| "1-ounce bottle | 3 cents |
| "2-ounce bottle | 3 cents |
| "3-ounce bottle | 3 cents |
| "4-ounce bottle | 3 cents |
| "6-ounce bottle | 7 cents |
| "8-ounce bottle | 7 cents |
| "12-ounce bottle | 7 cents |
| "16-ounce bottle | 7 cents |
| "32-ounce bottle | 10 cents |

" * * * The Durr Drug Company claims that the bottles and jars handled as hereinabove described, are sold by it to the retailers for resale, or that the bottle or jar sold with the medicine contained therein while chemically not a component part of the medicine contained therein, is such a necessary part of the manufacture of the completed prescription as to be a component part of the completed manufacturing process, and with the directions placed on such bottles, the Durr Drug Company claims the whole forms a single manufactured product, and in either event the bottles and jars are not taxable.

\*   \*   \*   \*   \*   \*

" * * * The Durr Drug Company purchases bottles in various sizes * * *. The company buys certain standard products such as turpentine in bulk or in large containers. *This turpentine respondent withdraws and places in small bottles properly labelled to be sold at retail at ten cents, or some proportionate price.* This unit is sold to retail druggists in wholesale quantities and *the retailer sells the unit constiting* (sic: consisting) *of the bottle, the contents, and the label in unchanged form at a unit price.* The cost of the bottle merges into and is an element of the finished bottled product, representing a substantial portion of the selling price which respondent charges the retailer, and is so computed by respondent and *is not considered or carried by it as a part of its general overhead expense.* The retailer in selling the article *collects the full sales tax on the price at which he sells* it to the purchaser. The cost of the bottles included in these sales plus respondent's profit thereon, is $3,062.-31, and the tax claimed thereon is $62.24." (Emphasis supplied.)

■ Comparison of the record in the case at bar with the stipulation in Durr Drug Company does not, as we see it, disclose any material difference in the manner in which bottles are used by the retail druggist. The fact that the retail customer is or is not informed of the elements making up the total price does not, as we see it, control the character of the transaction.

Taxation as contended for by the State does appear to result in collection of sales tax twice on the same bottle when used by taxpayer as set forth in the record in the instant case. The same situation ex-

**616**

isted in the Durr Drug Company case. As to bottles used to contain compounded medicines, the Legislature appears to have removed the double taxation. As to medicines not compounded, however, the Legislature has taken no action so far as we are advised.

Subsection (1) (i) of § 752, Title 51, Code of 1940, as amended, was further construed by this court in 1950, in State v. Wertheimer Bag Co., 253 Ala. 124, 43 So. 2d 824. One question there considered was whether or not Subsection (1) (i) exempted from sales tax the sale of burlap bags to a company which used the bags to package marble ground and sold by the company in the bags. This court held that such sales of bags were not exempt and said:

> "* * * We think it clear that the marble company, in executing the process of grinding the marble to the desired size for sale to contractors, is neither a manufacturer nor a compounder.
>
> * * * * * *
>
> "We hold, therefore, that the trial court was in error in overruling the assessment on the sales of bags to the Alabama Marble Company." 253 Ala. 124, 128, 129, 43 So.2d 828.

In the case at bar, taxpayer is not a manufacturer or compounder of medicine which is sold in the same form as when purchased by taxpayer, and bottles used to package such medicines are not containers of a manufactured or compounded product under Subsection (1) (i).

Because the facts in the instant case are not materially different from the facts in the Durr Drug Company case, supra, we are constrained by that authority to hold that bottles used by taxpayer to re-package medicines not compounded by it are subject to sales tax when the bottle is withdrawn from stock and so used.

Reversed and remanded.

All the Justices concur.